## SWANN *v.* WRIGHT'S EXECUTOR & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ALABAMA.

Argued December 18th, 19th, 1883.—Decided March 3d, 1884.

*Estoppel—Foreclosure Sale—Mortgage.*

A purchaser of a railroad at a sale under decree of foreclosure of a first mortgage, and of sale of the mortgaged property, which recites that the sale shall be made subject to liens established or to be established (on references before had or then pending, to a master, with right to bondholders to appear and oppose) as prior and superior liens to the lien of the bonds issued under the mortgage, cannot dispute the validity of the liens thus established, even on the ground of fraud alleged to have been discovered after confirmation of the master's report fixing the amount of the liens.

Whether holders of the mortgage bonds may not contest such liens, and, if successful, be substituted to so much thereof as was established for the benefit of the fraudulent claims is not decided.

The facts making the case are fully stated in the opinion of the court.

*Mr. David Clopton* and *Mr. S. F. Rice* for appellant.

*Mr. Moorfield Storey* and *Mr. P. Hamilton* for appellees.

Mr. Justice Harlan delivered the opinion of the court.

This is an appeal from a final decree dismissing a bill filed by John Swann against the executors of John S. Wright and the Alabama Great Southern Railroad Company, a corporation created under the laws of Alabama. Swann was the assignee of Wilder and McMillen, who were the purchasers at the sale in a foreclosure suit instituted on the 30th of May, 1872, by the trustees for the holders of bonds of the Alabama and Chattanooga Railroad Company, secured by a first mortgage upon its road, rights, franchises and property. With the assent of Wilder and McMillen, Swann was reported as purchaser, and the sale being confirmed a deed was made to him. Subsequently he conveyed all his right, title and interest to the Alabama Great Southern Railroad Company.

The complainant seeks to reopen the long-protracted contest in the foreclosure suit, between the first mortgage bondholders and the executors of John S. Wright, as to whether certain claims of the latter were liens upon the mortgage security. Appellees urge as a controlling consideration that the first mortgage bondholders acquiesce in the allowance of the Wright claims as having priority of lien over them; and they also contend that, in view of the several orders in the foreclosure suit, particularly the decree under which the sale of the mortgage property was had, and under which Swann claimed and received a deed, he has no standing in a court of equity to question the allowance of the Wright claims as superior liens upon the property. This proposition is controverted by appellant.

In order that appellant's relations to the property may be understood, and the questions involved in this appeal clearly comprehended, it is necessary to examine, somewhat in chronological order, the various steps taken in the foreclosure suit.

By an order made, in that suit, on the 26th day of August, 1872, Lewis Rice and W. J. Haralson were appointed receivers, with authority to put the Alabama and Chattanooga railroad and other property embraced in the first mortgage in repair; to complete any uncompleted portions thereof; to procure rolling stock, machinery, and other necessary things for operating the road; and to manage it to the best advantage, so as not only to prevent the property—then in a dilapidated condition, and being recklessly wasted—from further deterioration, but to preserve it for the benefit as well of the first mortgage bondholders as of all others having an interest in it. It was also ordered that all claims on account of moneys raised through the receivers by loan, or upon advances for the foregoing purposes, not exceding $1,200,000, "shall be a first lien, prior to all others, on the said railroad and other property, and to be paid for, before the said first mortgage bondholders, out of the proceeds of said property." The receivers were directed to issue certificates for moneys so raised, the loan to be made upon such terms as they might deem expedient:

"*Provided*, that said certificates shall not be disposed of for less than ninety cents to the dollar of their face, and, *also provided*, that interest thereon shall not be allowed at a greater rate than eight per cent. per annum, payable half-yearly; and such certificates shall not be issued until the same shall be countersigned by a majority of the trustees for said first mortgage bondholders, without which countersigning they shall not be entitled to the lien and priority aforesaid."

On the 23d day of January, 1874, a decree was passed for a sale of all the mortgage property as an entirety—the purchaser, upon confirmation of the sale and payment of the purchase money, to receive a conveyance, in fee simple, of all the right, title, and interest of the company, and of all persons claiming under it, in the railroad, premises, franchises, and property covered by the mortgage, and free from the claim of the defendants in that suit.

It was further decreed that the proceeds to arise from the sale, and which had arisen or should arise, in the hands of the

receivers, from the prosecution of the business of the company, or which had arisen or might arise in any other way from the property, are in law and equity liable to be applied in the following order : *First.* To the necessary expenses incident to the execution and due preservation of the trust created by the mortgage, including reasonable compensation to trustees and their counsel, and to the receivers, and all legal and necessary expenses then remaining unpaid, which had been properly incurred, with the authority of the court, in relation to the property. *Second.* To the payment of all taxes, charges, assessments, and liens prior in law to the lien of the mortgage ; all sums expended in perfecting the title to the right of way, or to any property formerly claimed by the company and then claimed to be embraced by the mortgage ; and " all liabilities incurred by the receivers, including such receivers' certificates or other receivers' indebtedness as may be sanctioned or ordered to be paid by this court, in accordance with the provisions hereinbefore contained." *Third.* To the payment of such of the first mortgage bonds, with their interest warrants, as may be reported by the master to have been *bona fide* issued and to be outstanding and unpaid. *Fourth.* The residue to be subject to such order and priority in distribution as the court should establish and decree, reserving for future consideration certain described bonds.

By the same decree it was declared :

" that all moneys which have been raised by said receivers by loan, or which may have been advanced by them for the purposes aforesaid, and which shall be ascertained by the decretal orders of this court to have been expended, or which may be expended, for the purposes contemplated by and in accordance with the said orders of this court, not exceeding the sum of $1,200,000, shall be a first lien prior to all others on the said railroad and other property, and to be paid before the said first mortgage bonds out of the proceeds of said property ; and nothing in this decree . . . shall impair the claims or rights of the creditors of the receivers appointed under either of said orders, or the owners of certificates issued by said receivers under said orders, or the holders of said certificates under.

hypothecation to the extent of money loaned and advanced on the same for the purposes aforesaid, with the interest and expense added thereto."

The cause was referred to Joseph W. Burke, as special commissioner, with directions to report all amounts necessary and proper to be paid out of the proceeds of sale as indicated by the decree.

On the 25th of April, 1874, an order was entered, upon the petition of the bondholders, suspending the sale of the property until the matters involved and under reference should be reported on and settled by the court; and allowing bondholders to appear in their own right before the commissioner and the court, and to contest any and all demands embraced by the order of reference, or that might arise before the court touching the property to be sold.

The reports of Commissioner Burke, made June 18th, 1874, and May 31st, 1875, show, that among the claims contested before, and allowed by him, were two by John S. Wright—those already referred to—one based upon receivers' certificates issued by Rice and Haralson, amounting, principal and interest, to $52,000, and the other, based upon like certificates, aggregating $56,444.44, which had been hypothecated to Wright as security for money advanced, as was alleged, to the receivers. For reasons, not disclosed by the record, this report was not satisfactory to the parties; and, by an order of June 11th, 1875, the court approved and gave effect to a written agreement between the contesting bondholders, the trustees, and the holders of receivers' certificates, whereby it was stipulated that the matters of reference involved in the cause should be referred to some well known lawyer and thorough business man, with authority to inquire into and settle the same. That agreement provided that such settlement should be final between the parties thereto, when confirmed by the court. Philip Phillips was thereupon appointed a special commissioner, with directions to review and re-examine, so far as the parties desired, the matters theretofore referred. If any of the receivers' certificates were objected to by either party, the commissioner was directed

to inquire and report whether they were issued and used in accordance with the orders in the cause, what disposition was made of them, what certificates should be allowed, and what rejected. Among the claims re-examined were those held by Wright. They were allowed, as shown by his report dated September 8th, 1875, and filed November 18th, 1875.

The cause was heard upon exceptions to the reports of Commissioners Burke and Phillips, and a comprehensive order made on the 14th day of February, 1876. As to the Wright claims, the order provided that nothing be then allowed thereon, and that:

"The whole matter of said claims, in respect of said sale, loan, and hypothecation [of receivers' certificates in the hands of Wright], and all circumstances connected with said transactions, be and the same are hereby referred to Lyman Gibbons as special master commissioner to take evidence upon, examine into and report upon said matters fully, with the evidence taken by him. Upon the coming in and confirmation of said special master's report the court will make a further decree thereon."

On the 4th of December, 1876—no report having been then made upon the Wright claims by the commissioner last appointed—the court made a decree for the sale of the mortgaged property, to take place on the 22d day of January, 1877. That decree provided that the sale "shall be subject to the liens established, or which may be established, by said court in this cause on references heretofore had and now pending, as prior and superior to the lien of the holders of bonds issued under the first mortgage, decreed to be foreclosed by former decree in said cause;" further, "that all money paid as earnest under this decree"—the sum of $300,000 was required for that purpose—"shall forthwith be reported to this court and be subject to its order, and that upon the confirmation of the sale made under this decree the purchaser shall have and be invested with a good title to the said railroad and property sold under this decree, subject only to what may remain unpaid of the claims and liens established by this court as paramount and superior to the liens of the first

mortgage and first mortgage bondholders;" still further, the balance of the purchaser's bid remaining after paying said earnest money was directed to be paid in such manner and at such time as the court may direct, "except that said balance may be paid by the purchaser in any claims which may have been established by the court in this cause as paramount and superior to the lien of said first mortgage and said first mortgage bondholders."

It has already been stated that Wilder and McMillen became the purchasers of the property. The amount bid by them was $600,000. Swann succeeded to their rights by an agreement made March 30th, 1877. The sale was reported to court on April 3d, 1877, the report showing that the benefits of the purchase had been transferred to Swann. Four days thereafter, April 7th, 1877, Commissioner Gibbons made his report in relation to the Wright claims, sustaining the conclusions reached by Commissioner Phillips, and expressing his entire conviction that those claims were correct and just.

On the 13th of June, 1877, that report came up for consideration. Swann, in his capacity as purchaser of the mortgaged property, moved that the Wright claims be re-submitted to the commissioner, with leave to produce additional evidence in opposition to them. That motion was denied. He then asked leave to file exceptions to the report. That application was also denied, and the report was in all things confirmed.

On the 15th of June, 1877, the sale to Swann was confirmed. By the decree of confirmation conveyances were required to be executed to him, covering all the property and rights purchased. It also provided that the deeds of conveyance

"Shall severally contain a provision to the effect that the same are made and executed, and the estate thereby granted and conveyed is made, executed, granted, and conveyed subject to all liens established at and before the decree made in this cause on the 4th day of December, 1876, or which may have been or may be established by this court in the cause, on reference heretofore had, and then pending, as prior and superior to the lien of the holders of bonds issued under the first mortgage,

decreed to be foreclosed by a former decree in said cause, so far as the several amounts secured by said prior liens remained unpaid at the time of said sale, and subject to the terms and requirements of this decree imposed upon or affecting the said purchaser . . . . And it is hereby declared and decreed that the said sale was and is subject to such prior liens (and that the said property is and shall be bound therefor, and for all interest that may accrue thereon ; and also subject to the same terms and requirements of this decree last above mentioned)." [Again, in the same decree:] "It is further ordered, adjudged, and decreed that the said sale was made subject to the payment of all valid and outstanding receivers' certificates heretofore established as valid by decree of this court or by this decree, including those which have been suspended on account of liability of the holders thereof on any official bond or bonds of any receiver or trustee, or on account of the indebtedness of such holder or holders to the trust fund ; but the amount due or to become due on such suspended certificates shall be paid, according to the tenor thereof, into this court in liquidation of such official bond or bonds, and of such indebtedness of the holder or holders thereof to the trust fund, to be disposed of as the court shall further direct."

This suit was commenced February 13th, 1878, after Swann had sold and conveyed such rights as he had acquired to the Alabama Great Southern Railroad Company. It proceeds upon the general ground that the transaction by which John S. Wright obtained the receivers' certificates in question was, as between him on one side and a trustee in the first mortgage and one of the receivers on the other side, in known violation of their respective duties, and contrary to law and public policy ; also, that Wright and his executors had, by fraud and imposition and by a concealment of the real facts, obtained, as well from the special masters the favorable reports hereinbefore referred to, as from the court, the decree confirming the report last made. It was dismissed by the court below, not only because, upon the showing, no case was made on the merits for the relief asked, but because the orders and decrees under which the sale was had and confirmed, and the deed made, required Swann to pay the liens established by the court

in the foreclosure suit, and precluded him from disputing them after they had been so established.

In our view of this case it is unnecessary to determine whether the bill is one of review for new evidence, or an original bill to impeach a decree for fraud, or an original bill in the nature of a bill of review; for we are of opinion that, whether belonging to one class or the other, it was properly dismissed. The claim of appellant, as the purchaser of the property, to reopen the litigation, to which he was not a party, and which related to liens expressly subject to which the property was sold, purchased, and conveyed, and which liens were fully examined upon issues between and notice to those who, at the time the decree of sale was rendered, were alone interested in their recognition or rejection, does not seem to rest upon any foundation of justice or equity. We have seen that the original purpose of those promoting the foreclosure suit was to have the mortgaged property sold, at an early day after the commencement of the litigation, entirely free from encumbrance, leaving the court to provide, out of the proceeds of sale, for the expenses of the trust, and to make such distribution of the balance as was consistent with the rights of those having an interest in or liens upon the property. But this idea was abandoned, at the instance of the bondholders, and the sale suspended in order to ascertain, if possible, before sale, the exact amount of all claims superior to the lien given by the mortgage. Among those alleged to be of that character were the claims presented originally by Wright and subsequently prosecuted by his executors. They were vigorously contested before Commissioners Burke and Phillips by those who were directly interested in defeating them, namely, the bondholders and their trustees. They received the approval of each of these commissioners; and while they were under examination by Commissioner Gibbons, before whom that contest was renewed, the court, feeling doubtless that the sale of the mortgaged property had been already deferred sufficiently long, made an order for its sale on a day named. That order materially modified the original decree. Instead of selling the property free of all encumbrances, so that the purchaser, as a con-

dition of receiving a complete title, would only be required to pay the amount bid, the sale was ordered expressly subject, not simply to liens which had then (December 4th, 1876), been established as prior and superior to the lien of the bondholders, but to all liens of that character which might be established on references theretofore ordered, and then pending. The claims of Wright were being pressed before the special commissioner as belonging to that class. The latter had before him all parties in interest, either in person or by representation. And his examination was being conducted under a reference previously made, and then pending. So that, as respects these claims, purchasers were explicitly warned that they must buy the property, and take title thereto, subject to their future allowance by the court. That warning was as distinct as if the claims had been specifically described in the decree by the names of the parties prosecuting them. Wilder and McMillen, therefore, purchased, and their assignee or vendee obtained the property, subject to a prior lien in favor of Wright's estate, if any such lien should be thereafter established on pending references. And although Swann has conveyed the property to the Alabama Great Southern Railroad Company, not only without covenants of warranty, but with a clause in the deed distinctly declaring that it shall not be construed "to express or imply any covenant" by him, he now asks the court to recognize his right, as purchaser, upon newly discovered evidence, to show that the lien established in behalf of Wright's estate ought not to have been recognized. When his assignors or vendors purchased, they knew, or, by inspection of the record, could have known of the pendency of the Wright claims. Before the sale was confirmed the court declined to permit him, as purchaser, to reopen the dispute as to those claims. He made no suggestion that he purchased in ignorance, either of their existence, or of the reservation by the court of its right to establish them as superior liens upon the property; nor that they had been allowed for larger amounts than originally contended for; nor did he ask, in view of their allowance, that he be permitted to surrender his purchase, so that the property could be resold for the benefit, primarily, of

those having first liens. On the contrary, without objection from him, the sale was confirmed, upon the condition, explicitly declared in the order of court, that the purchaser bought subject to all liens of the character described in the decree of sale, and that such subordination of his and their rights to those liens should be expressed in the conveyance to him. The conveyance was so drawn, and was accepted by him; and in his deed to the Alabama Great Southern Railroad Company, under date of November 30th, 1877, he states that the conveyance to him "of said railroad, equipments, appurtenances, and property has been executed and delivered" by commissioners of court, "in accordance with the orders and decrees of said court." He here proceeds upon the assumption that, while asserting title in himself, under and by virtue of the decree of sale, he may claim the aid of a court of equity in repudiating the essential conditions upon which he received title; and, that, too, without offering, or being in a condition to offer, a return of the property, in which contingency—the Wright claims being disallowed—it might be resold for the benefit of the bondholders, unencumbered by those claims. The property was sold with the possibility, present in the minds as well of the parties in the foreclosure suit as of purchasers, that the latter would be required to take subject to a lien in behalf of Wright's estate; and, consequently, that to the extent of such lien, the first mortgage bondholders would fail in having their demands satisfied out of the property. If, therefore, the appellant were granted the relief asked, the result—upon his theory of the respective rights of himself and the bondholders —would be, not to benefit those who caused the property to be sold, but, in effect, to give the amount of the Wright claims to Swann; or, if not to him, then indirectly to the company to which he has conveyed, and which must assert its rights, whenever assailed, under one who has taken title expressly subject to a lien in favor of those claims.

It may be observed, in this connection, that the appellant's counsel lay great stress upon that part of the order of June 15th, 1877, which declares that the sale, then confirmed, had been made subject to the payment of "all valid and outstand-

ing receivers' certificates." They insist that the certificates to Wright were not valid, because obtained, as alleged, by fraud and imposition, and in violation of the duty of the trustee and receiver who conducted the negotiations with Wright. It is sufficient to say, that, according to any proper interpretation of that order, all receivers' certificates were to be deemed valid, so far as purchasers were concerned, that were within the aggregate amount limited for certificates, and which, being embraced in references theretofore made or then pending, had been, or might be, established, between the holders and the mortgagees, as liens upon the property.

If the court had, in the decree of sale, reserved to the purchaser, although not a party to the proceedings, the right to appear and contest any alleged liens then under examination, and, therefore, not established by the court, an entirely different question would have been presented. But no such reservation was made; and the purchaser was required, without qualification, to take the property, upon confirmation of the sale, subject to the liens already established, or which might, on pending references, be established as prior and superior to the liens of the first mortgage bondholders. We do not mean to decide that the bondholders, as such (had they moved in due time), might not have maintained a suit like the present one, and, if successful, required the purchaser to pay them an additional amount equal to the claims established for the benefit of Wright's estate. Upon the question involved in that suggestion we express no opinion. All that we decide is, that in view of the express terms of the decree of sale, and since neither the purchaser nor his grantee proposes to surrender the property to be resold for the benefit of those concerned, such purchaser has no standing in court for the purpose of re-litigating the liens expressly subject to which he bought and took title. The allegations of fraud and imposition alleged to have been practised by Wright and others by means whereof, it is contended, the claims in question were approved and established—whatever consideration they would have been entitled to in a suit brought by the bondholders—do not present matters which, under the circumstances, concern the appellant as purchaser of the prop-

erty. If the receiver and trustee referred to in the bill were guilty of fraud and imposition in respect of the Wright claims, it was competent for the bondholders and the parties interested in the property, before title was passed to the purchaser, to waive any grounds of complaint which they may have had on that account. And they had the right to acquiesce, and so far as the record discloses, have acquiesced in their allowance, thereby consenting that the proceeds of sale, to the amount of such claims, should be applied in payment thereof, rather than in satisfaction of their own demands. The appellant presents no grounds upon which he can be relieved from his obligation to comply with the terms of purchase as set forth in the decree of sale and as expressed as well in the order of confirmation, as in the conveyance to him.

Upon the grounds indicated the decree is

*Affirmed.*